## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BOBBIE CARNE; ALL MY TOMORROWS PET RESCUE a California corporation; ELEANOR TRIBOLETTI; CAROLINE GRAYSON,**<br><br>**Plaintiffs**<br><br>v.<br><br>**STANISLAUS COUNTY ANIMAL SERVICES AGENCY; ANNETTE PATTON, in her individual and official capacities; CONNIE HOOKER, in her individual and official capacities; and DOES 1-50 inclusive,**<br><br>**Defendants** | **CASE NO. 1:19-CV-1151 AWI SKO**<br><br>**ORDER RE: MOTION TO DISMISS**<br><br><br>**(Doc. 25)** |

## I. Introduction

Plaintiffs Bobbie Carne and Caroline Grayson are persons who have volunteered or been to the Stanislaus County animal shelter ("Stanislaus Shelter"). Plaintiff All My Tomorrows Pet Rescue is a nonprofit animal rescue organization which has attempted to take animals from the Stanislaus Shelter to prevent their euthanization. Plaintiff Eleanor Triboletti is the founder and CEO of All My Tomorrows Pet Rescue. Defendant Stanislaus County Animal Services Agency is a political subdivision of the state of California which operates the Stanislaus Shelter. Defendant Annette Patton is the Director and Defendant Connie Hooker is the Animal Control Supervisor of the Stanislaus Shelter.

The Hayden Act is a California law passed in 1998 that regulated the treatment of animals in state run animal shelters, generally required the release of the animals to rescue organizations,

and limited the ability of shelters to euthanize animals.  Plaintiffs believe that Defendants have violated the Hayden Act in the operation of the Stanislaus Shelter by failing to provide appropriate veterinary care, failing to cooperate with animal rescue organizations, and improperly euthanizing animals.  Plaintiffs allege that after they began publicly criticizing the Stanislaus Shelter on social media platforms, Defendants retaliated against them.  Defendants allegedly banned Plaintiffs from the Stanislaus Shelter, forbade them from filming inside the Stanislaus Shelter, threatened to remove persons who expressed criticism from a networker email list, called the police on Plaintiff Carne claiming that Plaintiff Carne was harassing staff members, and falsely stated that Plaintiff Carne had threatened to run over Defendant Patton with a bus.

Plaintiffs initially filed suit against Defendants in the Stanislaus County Superior Court.  At that time, they alleged violations of 42 U.S.C. § 1983 and a number of state causes of action.  Defendants removed the case to federal court.  Upon motion by the parties, the state causes of action were remanded and Plaintiffs were directed to file an amended complaint. Doc. 22.  The operative complaint is the Second Amended Complaint. Doc. 24.  Plaintiffs are asserting liability under 42 U.S.C. § 1983 for violation of First Amendment rights (both individual and municipal liability).  Defendants filed a motion to dismiss all claims. Doc. 25.  Plaintiffs oppose the motion. Doc. 26.

## II. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of the plaintiff's "failure to state a claim upon which relief can be granted." Fed. Rule Civ. Proc. 12(b)(6).  A dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory. Conservation Force v. Salazar, 646 F.3d 1240, 1242 (9th Cir. 2011); Johnson v. Riverside Healthcare Sys., 534 F.3d 1116, 1121 (9th Cir. 2008).  In reviewing a complaint under Rule 12(b)(6), all allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. Faulkner v. ADT Sec. Servs., 706 F.3d 1017, 1019 (9th Cir. 2013).  However, complaints that offer no more than "labels and conclusions" or "a formulaic recitation of the elements of action

1  will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  The Court is not required "to accept as
2  true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable
3  inferences." Wilson v. Hewlett-Packard Co., 668 F.3d 1136, 1145 n. 4 (9th Cir. 2012); Sprewell v.
4  Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001).  To avoid a Rule 12(b)(6) dismissal, "a
5  complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is
6  plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that
7  allows the court draw the reasonable inference that the defendant is liable for the misconduct
8  alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more
9  than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662,
10 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007).  The Ninth Circuit has
11 distilled the following principles from Iqbal and Twombly: (1) to be entitled to the presumption of
12 truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of
13 action, but must contain sufficient allegations of underlying facts to give fair notice and to enable
14 the opposing party to defend itself effectively; (2) the factual allegations that are taken as true
15 must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing
16 party to be subjected to the expense of discovery and continued litigation. Starr v. Baca, 652 F.3d
17 1202, 1216 (9th Cir. 2011).  In assessing a motion to dismiss, courts may consider documents
18 attached to the complaint, documents incorporated by reference in the complaint, or matters of
19 judicial notice. Dichter-Mad Family Partners. LLP v. United States, 709 F.3d 749, 761 (9th Cir.
20 2013).

### III. Discussion

**A. Official Capacity Suits**

Plaintiffs seek to sue both the Stanislaus County Animal Service Agency directly and Patton and Hooker in their official capacities.  Doc. 24, 9:17-18.  "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.  Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" Kentucky v. Graham, 473 U.S. 159, 165-66

3

(1985), quoting Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690, n. 55 (1978).  Thus, suing Patton and Hooker in their official capacities is duplicative.  The claims against Patton and Hooker in their official capacities are dismissed.

**B. Plaintiffs Carne and Grayson**

**1. Selective Enforcement**

Plaintiffs allege "Defendants permitted Plaintiff Carne to videotape and photograph animals in the shelter for well over a year, which changed as soon as Carne started making criticisms on social media of the shelter's practices. Suddenly, Carne was restricted from videotaping, and was told she needed to seek permission, which was then denied by Defendant Hooker.  The same restrictions were not placed on other volunteers who had not voiced concerns about the shelter's practices.  Accordingly, Plaintiffs can establish that the application of this policy with only Carne can be construed as selective enforcement, and therefore violative of Plaintiff Carne's First Amendment rights…. Further, Defendants' restriction of Plaintiff Grayson from videotaping at the shelter could also be construed as selective enforcement, and thus a violation of Plaintiff's First Amendment rights." Doc. 26, 6:21-7:1.  In a case discussing the right of persons to videotape inside agricultural production facilities, the Ninth Circuit stated that "we have recognized that there is a 'First Amendment right to film matters of public interest.' It defies common sense to disaggregate the creation of the video from the video or audio recording itself. The act of recording is itself an inherently expressive activity; decisions about content, composition, lighting, volume, and angles, among others, are expressive in the same way as the written word or a musical score." Animal Legal Def. Fund v. Wasden, 878 F.3d 1184, 1203 (9th Cir. 2018), quoting Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir. 1995).

Defendants argue that "selective enforcement is founded on the Equal Protection Clause of the Fourteenth Amendment…not the First Amendment." Doc. 27, 5:2-3.  While selective enforcement is typically a Fourteenth Amendment claim, "A similar claim arises under the First Amendment where 'discriminatory enforcement of a speech restriction amount[s] to viewpoint discrimination.'" Ballentine v. Las Vegas Metro. Police Dep't, 2017 U.S. Dist. LEXIS 133777, at

4

*14 (D. Nev. Aug. 21, 2017), quoting <u>Menotti v. City of Seattle</u>, 409 F.3d 1113, 1146-47 (9th Cir. 2005).  In this case, Plaintiffs' theory is that Defendants are selectively enforcing a videotaping in retaliation for their prior criticism of the Stanislaus Shelter. See Doc. 24, 12:16-23.  "[W]here a plaintiff is asserting a separate First Amendment retaliation claim, and where, as here, the plaintiff's selective enforcement equal protection claim is also based on alleged retaliation for the exercise of First Amendment rights, the selective enforcement claim and First Amendment retaliation claims 'coalesce.'" <u>Geiger v. Town of Greece</u>, 2007 U.S. Dist. LEXIS 87466, at *33 (W.D.N.Y. Sep. 4, 2007); see also <u>Hill v. City of Scranton</u>, 411 F.3d 118, 125-26 (3d Cir. 2005) ("The officers' First Amendment and Equal Protection claims are functionally identical and it would be redundant to treat them separately").  The issues of selective enforcement will be considered as part of Plaintiffs' retaliation claim since it encompasses a broader set of allegedly retaliatory acts.

**2. Forum Status**

Plaintiffs allege that "Defendants PATTON and HOOVER violated Plaintiffs' First Amendment rights by restricting Plaintiffs' rights to video and audio record County shelter administrators and public employees when the employees were performing their public duties, the employees were in a place typically designated as public areas in the shelter, and when the employees were speaking at a volume audible to the unassisted human ear.  The Free Speech Clause of the First Amendment protects the rights to gather, receive, or record the information at issue herein, as well as for purposes of using that information to petition government for redress of grievances.  The Free Speech Clause further protects the rights to gather, receive, or record the information at issue herein for purposes of disseminating and publishing that information to other people. Defendants' conduct in implementing and executing policies restricting Plaintiffs' attempts to video and audio record both animals in the shelter as well as employees while conducting their public duties was a violation of Plaintiffs' rights pursuant to the First Amendment." Doc. 24, 13:4-15.

The parties disagree on whether the Stanislaus Shelter (or any part of it) is a public forum.

However, the forum status of the facility is not directly relevant to Plaintiffs' claims.  Plaintiffs state that "other individuals were permitted to video without consent and without the same restrictions." Doc. 24, 7:26-27.  Plaintiffs make no argument that they were prevented from videotaping based on the kind of video they were making or any contemporaneous statements they made while inside the Stanislaus Shelter.  Instead, Plaintiffs clearly assert that they were denied access due to their criticism on social media sites.  Plaintiffs have not plead that there is any restriction on videotaping based on the content of the video; instead, their claims are solely that Defendants are denying access to the Stanislaus Shelter as a means to punish Plaintiffs for statements made outside the facility.  The gravamen of the suit is one of retaliation.

**3. Retaliation**

In addition to preventing Plaintiffs Carne and Grayson from videotaping at the Stanislaus Shelter, Plaintiffs assert that "After Carne started making critical comments about the shelter's practices, including on social media, she began experiencing increased harassment from Defendants Hooker and Patton, including having her volunteer application denied, and being banned from the shelter on December 20, 2017. (SAC, ¶ 16.)  Defendants continued singling out Carne and treating her poorly, contacting police and falsely claiming she was being disruptive, making false statements to others about Carne's conduct and statements. (SAC, ¶¶ 16-20.)  Defendant Patton went so far as to make false statements to others that Carne had edited and 'faked' photographs of dogs in the shelter to make their condition appear worse. (SAC, ¶ 18.)" Doc. 26, 8:22-9:3.  On December 20, 2018, Plaintiff Grayson went to the Stanislaus Shelter to "assist in evaluating dogs, obtain photographs and videos in order to network with rescues and on social media" to try to find places for a large number of dogs who were scheduled to be euthanized; Defendant Hooker told her "to stop videotaping and to leave the shelter." Doc. 24, 8:20-25.

"Otherwise lawful government action may nonetheless be unlawful if motivated by retaliation for having engaged in activity protected under the First Amendment….'[A] plaintiff must show that (1) he was engaged in a constitutionally protected activity, (2) the defendant's

6

actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct.'" O'Brien v. Welty, 818 F.3d 920, 932 (9th Cir. 2016), quoting Pinard v. Clatskanie Sch. Dist. 6J, 467 F.3d 755 (9th Cir. 2006); see also Capp v. Cty. of San Diego, 940 F.3d 1046, 1053 (9th Cir. 2019) (applying standard to retaliatory acts committed by police officers).

Defendants agree that "public criticism of the shelter's operations or kennel conditions are arguably a matter of public concern" which constitutes a constitutionally protected activity but argue that Plaintiffs have insufficiently alleged that they criticized the Stanislaus Shelter. Doc. 25, 10:25-27.  The operative complaint includes allegations that "Carne made several complaints on social media, including, but not limited to, September 27, 2017, October 24, 2017, October 31, 2017 expressing criticism of the shelter's practices.  For example, on September 27, 2017, Carne posted on Facebook about several dogs that had been improperly euthanized at the shelter – dogs that she had just spent extensive time working with in the previous couple of days" and "Grayson had previously been critical of shelter practices in her comments and support of others critical of the shelter on Facebook, and had associated with other individuals known to be critical of the shelter." Doc. 24, 8:16-18.  These allegations are sufficient to satisfy the first requirement at this stage.  Defendants do not challenge the second requirement. See Doc. 25, 10:16-11:8; Doc. 27, 6:26-7:19.

Regarding whether Plaintiffs' criticism was a factor in Defendants' conduct, Defendants argue that the allegations are "too vague to state a claim, particularly for purposes of a causal connection." Doc. 27, 7:17-18.  In this case, Plaintiffs allege that Defendants were aware of the criticism.  With respect to Plaintiff Grayson: "Upon information and belief, HOOKER and other staff members were aware at the time that Grayson had previously been critical of shelter practices in her comments and support of others critical of the shelter on Facebook, and had associated with other individuals known to be critical of the shelter." Doc. 24, 8:15-19.  With respect to Plaintiff Carne: "certain shelter employees made mention of Carne's criticisms, such that she knew Defendants HOOKER and PATTON were aware of her Facebook posts and had been reading them.  For example, on one occasion when Carne was escorted out of the shelter by police (after a

7

request by PATTON), PATTON made a comment as she was leaving to the effect of: 'Don't worry, she'll post it on Facebook like she always does…' In addition, one staff member (currently employed at the shelter), Jamie Heilman, reacted to the Facebook post, so it was clear that shelter staff was aware of Carne's negative comments about shelter practices on Facebook." Doc. 24, 6:2-9. Where a plaintiff allege that "defendants were aware of Plaintiff's protected speech" and "also pleads circumstances which make his allegation of awareness plausible," the allegations are sufficient to show the protected activity was a substantial or motivating factor at the motion to dismiss stage. inaccuracies Maa v. Ostroff, 2013 U.S. Dist. LEXIS 152527, at *34 (N.D. Cal. Oct. 23, 2013). Plaintiffs allege that they believed Defendants knew of the criticism and of facts that support that belief.

Plaintiffs Carne and Grayson have stated a First Amendment retaliation claim against Defendants Patton and Hooker.

### 4. Monell Liability

"Under the familiar Monell analysis, a plaintiff may establish municipal liability by establishing that (1) the constitutional violation was the result of a governmental policy or a longstanding practice or custom; (2) the individual who committed the constitutional violation was an official with final policy-making authority; or (3) an official with final policy-making authority ratified the unconstitutional act." Heath v. City of Desert Hot Springs, 618 F. App'x 882, 885 (9th Cir. 2015), citing Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1992). With respect to the claims, Plaintiffs allege in the operative complaint that "Both PATTON and HOOKER were policymakers at the shelter." Doc. 24, 10:20-21. They explain that "certain actions have been committed by employees at the shelter with top policymaking authority, including Hooker and Patton." Doc. 26, 5:11-12. It appears that Plaintiffs are arguing the Monell liability applies because the individuals who committed the violations were officials with final policy-making authority. Plaintiffs state that "Defendant, ANNETTE PATTON is, and at all times relevant to the complaint, was employed by STANISLAUS COUNTY ANIMAL SERVICES AGENCY as the Director or other administrative role" and that "Defendant, CONNIE HOOKER is, and at all times

relevant to the complaint, was employed by STANISLAUS COUNTY ANIMAL SERVICES AGENCY as the Animal Control Supervisor." Doc. 24, 3:22-27.

"[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986). "[W]hether a particular official has 'final policymaking authority' is a question of state law." City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988), citing Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986). Plaintiffs have cited to no law or regulation that supports a finding that either Defendant Patton or Defendant Hooker had final policymaking authority. To state this kind of Monell claim, a plaintiff must provide law that plausibly suggests the identified individual has the appropriate authority over the conduct at issue. Muir v. City of Placentia, 2020 WL 4342545, at *4 (C.D. Cal. Apr. 15, 2020) ("Plaintiff's allegation that each individual defendant possessed final policymaking authority as delegated by the City (and/or Defendant Lenyi) is conclusory and, therefore, insufficient. Although at this stage Plaintiff certainly need not offer evidence that the individual defendants possessed final policymaking authority in employment-related decisions, he must be able to 'point[ ] to [a] charter, municipal code, ordinance, or other enactment' that would suggest the individual defendants had the requisite kind of authority")

Plaintiffs Carne and Grayson's Monell claim is dismissed without prejudice.

**5. Statute of Limitations**

Defendants argue that Carne's claims are beyond that of the statute of limitations. Doc. 25, 11:15-12:2. Plaintiffs initially filed suit on December 18, 2018 in Stanislaus County Superior Court. Doc. 1. Plaintiffs' key factual allegations concern events that have happened in 2017 through 2019. See Doc. 24, 5:3-8:2. The applicable statute of limitations for 42 U.S.C. § 1983 claims in California is two years. Maldonado v. Harris, 370 F.3d 945, 954 (9th Cir. 2004). Plaintiffs' claims are timely.

**C. Plaintiffs All My Tomorrows Pet Rescue and Triboletti**

In the operative complaint, Plaintiffs allege "On or about April 2, 2019, one of Defendant STANISLAUS' employees sent an email to the email group advising that 'if there is bad mouthing, threatening, or disrespectful emails, communication, or posts on social media, that [they] would be removed from the networkers email group.' She further advised that one particular rescue who had expressed criticism of the shelter's practices was already removed….Plaintiff Triboletti is, and was at all relevant times, a rescue and member of the networkers email group. This email, as well as other negative treatment she witnessed by shelter staff against persons that spoke up on behalf of the animals, created fear of retaliation. Triboletti and others were afraid to speak up as they feared being excluded altogether from being able to rescue animals in the shelter's care." Doc. 24, 9:4-14. "The policy was sent via email from the shelter's primary account: Rescue@stancounty.com. This email is monitored and used by various administrative staff at the shelter, including HOOKER. It is the manner in which the shelter corresponds with rescues and volunteers, as well as the networkers email group, and how rules and policies are disseminated from the shelter to volunteers and rescues. Accordingly, the April 2, 2019 should be construed as official policy communicated from the shelter, and Plaintiff Triboletti and others reasonably believed that this communication represented official shelter policy." Doc. 24, 11:1-7. This claim is plead only as a Monell claim; Plaintiffs have not asserted individual liability.

Plaintiffs argue that this qualifies as "an illegal prior restraint." Doc. 26, 3:21. "The term 'prior restraint' is used 'to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.'" Alexander v. United States, 509 U.S. 544, 550 (1993), quoting M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4-14 (1984). "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights. A criminal penalty or a judgment in a defamation case is subject to the whole panoply of protections afforded by deferring the impact of the judgment until all avenues of appellate review have been exhausted. Only after judgment has become final, correct or otherwise, does the law's sanction become fully operative.

1   A prior restraint, by contrast and by definition, has an immediate and irreversible sanction. If it
2   can be said that a threat of criminal or civil sanctions after publication 'chills' speech, prior
3   restraint 'freezes' it at least for the time." Neb. Press Ass'n v. Stuart, 427 U.S. 539, 559 (1976).
4   The email does not qualify as a prior restraint.  It does not enjoin or legally forbid Plaintiffs from
5   exercising their rights of free speech.

6   In essence, this claim is also based on a First Amendment retaliation theory.  Plaintiffs
7   recognize in their operative complaint, they have a "fear of retaliation." Doc. 24, 9:13.  Again
8   "'[A] plaintiff must show that (1) he was engaged in a constitutionally protected activity, (2) the
9   defendant's actions would chill a person of ordinary firmness from continuing to engage in the
10  protected activity and (3) the protected activity was a substantial or motivating factor in the
11  defendant's conduct.'" O'Brien v. Welty, 818 F.3d 920, 932 (9th Cir. 2016), quoting Pinard v.
12  Clatskanie Sch. Dist. 6J, 467 F.3d 755 (9th Cir. 2006).  But with regards to this claim, Plaintiffs
13  All My Tomorrows Pet Rescue and Triboletti have not yet engaged in the constitutionally
14  protected activity; there has been no retaliation because there has been no speech challenging the
15  Defendants.

16  "Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of
17  premature adjudication, from entangling themselves in abstract disagreements over administrative
18  policies, and also to protect the agencies from judicial interference until an administrative decision
19  has been formalized and its effects felt in a concrete way by the challenging parties.  The ripeness
20  doctrine is drawn both from Article III limitations on judicial power and from prudential reasons
21  for refusing to exercise jurisdiction, but, even in a case raising only prudential concerns, the
22  question of ripeness may be considered on a court's own motion.  Determining whether
23  administrative action is ripe for judicial review requires us to evaluate (1) the fitness of the issues
24  for judicial decision and (2) the hardship to the parties of withholding court consideration." Nat'l
25  Park Hosp. Ass'n v. DOI, 538 U.S. 803, 807-08 (2003), citations and quotations omitted.

26  With respect to the fitness of the issues, "traditional ripeness analysis has been relaxed
27  somewhat in cases involving facial challenges based on First Amendment grounds." Nutritional
28  Health All. v. Shalala, 144 F.3d 220, 226 (2d Cir. 1998); see also Democratic Nat'l. Comm. v.

Watada, 198 F. Supp. 2d 1193, 1201 (D. Haw. 2002) (no looser ripeness analysis for "an 'as applied' challenge"). "While 'pure legal questions that require little factual development are more likely to be ripe,' a party bringing a preenforcement challenge must nonetheless present a 'concrete factual situation . . . to delineate the boundaries of what conduct the government may or may not regulate without running afoul' of the Constitution." Alaska Right to Life v. Feldman, 504 F.3d 840, 849 (9th Cir. 2007), quoting San Diego Gun Rights Comm. v. Reno, 98 F.3d 1121, 1132 (9th Cir. 1996).

In the present case, the claim is centered on the email. However, Defendants state that "Plaintiffs appear to intentionally mischaracterize the email admonishment which appears to seek decorum in communication, into one curtailing criticism." Doc. 25, 10:12-13. With a factual dispute over the meaning behind the wording of an email, the claim may not be suited for resolution on a facial challenge basis. Declining to address the claim at this point could impose a hardship on Plaintiffs as they might feel deterred from exercising their First Amendment rights. But, this case does not involve a criminal penalty or even any kind of civil fines. Also, the case will proceed with Plaintiffs Carne and Grayson's claims. As their claims mirror those of Plaintiffs All My Tomorrows Pet Rescue and Triboletti, the legal question of whether Defendants can deny access to or otherwise punish persons who criticize the Stanislaus Shelter will likely be settled in this case. "Prudential considerations of ripeness are discretionary." Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1142 (9th Cir. 2000). Plaintiffs All My Tomorrows Pet Rescue and Triboletti's claims are dismissed for lack of ripeness.

///
///
///
///
///
///

**IV. Order**

1. Defendants' motion to dismiss is GRANTED in part and DENIED in part.

2. Claims against Defendants Patton and Hooker in their official capacity are DISMISSED with prejudice.

3. Plaintiffs Carne and Grayson's claims against Defendant Stanislaus County Animal Services Agency are DISMISSED without prejudice.

3. Plaintiffs All My Tomorrows Pet Rescue and Triboletti's claims are DISMISSED for lack of ripeness.

IT IS SO ORDERED.

Dated:   March 30, 2021                              _____
                                                                          SENIOR   DISTRICT   JUDGE